NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0539n.06
Filed: August 1, 2006

No. 05-3644

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| HARMONY COURT, ) | |
| ) | |
| Petitioner, ) | ON APPEAL FROM A FINAL DECISION |
| ) | OF THE DEPARTMENTAL APPEALS |
| v. ) | BOARD OF THE UNITED STATES |
| ) | DEPARTMENT OF HEALTH AND |
| MIKE LEAVITT, Secretary of the United ) | HUMAN SERVICES |
| States Department of Health and Human ) | |
| Services, ) | |
| ) | |
| Respondent. | |

Before: GILMAN and SUTTON, Circuit Judges; WISEMAN, District Judge.[*]

SUTTON, Circuit Judge. Harmony Court, a skilled nursing facility located in Cincinnati, Ohio, contends that the Departmental Appeals Board of the United States Department of Health and Human Services mistakenly upheld an award of civil money penalties against Harmony Court for noncompliance with multiple Medicare program-participation requirements. Because substantial evidence supports the Board's decision, we affirm.

---

[*] The Honorable Thomas A. Wiseman, Jr., Senior United States District Judge for the Middle District of Tennessee, sitting by designation.

I.

On November 5, 1999, a state agency, the Ohio Department of Health, completed a complaint survey of Harmony Court, which identified nine Medicare program-participation requirements that the facility had violated.

On December 15, 1999, the state agency performed a revisit survey and determined that Harmony Court was in substantial compliance as of December 10, 1999.

On January 19, 2000, after its annual survey of Harmony Court, the agency charged the facility with 23 violations of the Medicare program-participation requirements. On March 10, 2000, the agency performed a revisit survey and found six violations. And on April 15, 2000, the agency performed a (re)revisit survey and found the facility in substantial compliance as of March 26, 2000.

All of these visits considered, the agency cited Harmony Court for 29 violations that the agency was unwilling to waive. On the basis of these violations, it levied fines against the facility in the amount of $1,150 per day from November 5 to December 9, 1999, and $550 per day from January 19 to March 25, 2000—a total of $77,100.

Harmony Court filed an administrative challenge to the fine. Perhaps recognizing that a finding of one violation may suffice to impose civil money penalties, *Beechwood Sanitarium*, DAB No. 1824 (2002), the facility challenged the propriety of every violation. In reviewing the petition, the Administrative Law Judge, also mindful that one violation may suffice to uphold a penalty,

analyzed a sampling of the violations. She concluded that the facility had failed to comply with 12 participation requirements—with at least 1 violation per survey cycle—and that the civil penalty was reasonable.

The facility appealed the ALJ's decision to the Departmental Appeals Board, challenging each violation addressed and upheld by the ALJ. The Board sustained all of the ALJ's findings.

## II.

In reviewing the Board's imposition of civil money penalties, "[o]ur standard of review is highly deferential." *Woodstock Care Ctr. v. Thompson*, 363 F.3d 583, 588 (6th Cir. 2003) (per curiam). "'The findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.'" *Id.* (quoting 42 U.S.C. § 1320a-7a(e) (2001)).

## A.

Harmony Court first argues that the ALJ and the Board applied the wrong standard of review by placing the burden of persuasion on the facility under *Hillman Rehabilitation Ctr.*, DAB No. 1611 (1997), *aff'd*, *Hillman Rehabilitation Ctr. v. United States*, No. 98-3789 (GEB) (D.N.J. May 13, 1999). But as the facility has conceded, this contention could affect the outcome of this dispute only if the evidence were in equipoise. "Because the evidence is not in equipoise in this case, *Hillman* is not dispositive of the result here," *Batavia Nursing & Convalescent Ctr. v. Thompson*,

143 Fed. Appx. 664, 665 (6th Cir. 2005), and we accordingly need not reach the validity of that administrative decision.

B.

Harmony Court next argues that substantial evidence does not support the civil penalty for lack of compliance with the Medicare program-participation requirements. Like the ALJ and the Board, we need not address each and every violation. The Board specifically addressed, and upheld, 12 violations. We will limit our discussion to the substantial evidence that undergirds one example of each type of violation—as organized by the regulation at issue.

1.      42 C.F.R. § 483.15(g)(1)

This regulation requires a facility to "provide medically-related social services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident." In applying this regulation, the ALJ found that Harmony Court did not conduct adequate interventions to stop Resident 105 from leaving the facility or to find him alternative living arrangements. Resident 105 abused alcohol, which created a significant risk of injury to himself and others—particularly when he left the facility on weekends and returned intoxicated. As a result of these incidents, his doctor recommended that he not be permitted to leave the facility.

Substantial evidence supports a finding that this regulation was violated. For one, the facility frequently allowed Resident 105 to leave the facility—despite his doctor's recommendation. For

another, despite his abuse of alcohol, the facility's social-progress notes made scant reference to his drinking binges or even to his having an alcohol problem. Though he returned to the facility drunk on November 17, 1999, and Harmony Court administered a blood-alcohol test at that point, his social-service records remained largely inattentive to this issue.

2.      42 C.F.R. § 483.25

This regulation requires a facility to "provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychological well-being, in accordance with the comprehensive assessment and plan of care." In finding that the facility violated this regulation, the ALJ identified deficiencies in the care of three residents, premised on the credible testimony of the state surveyor. One resident, Resident 13, was in a geri-chair with a pelvic restraint and a worn pommel cushion on the chair. On one occasion, Resident 13's buttocks had slid so far forward in the chair that the pelvic restraint tightly wedged into her body folds. Both her positioning in the chair and the placement of the pelvic restraint caused reddening to her perineal area and her upper thighs. The pommel cushion was so worn that it did not prevent Resident 13 from sliding in her chair and ultimately sustaining injuries to her perineal area and upper thighs. Resident 13 actually suffered some injuries and was at risk of suffering more.

The facility did not explain why it did not have a sufficient number of pommel cushions in stock to replace Resident 13's worn cushion. Nor did it explain why it failed to order a specialized wheelchair for Resident 13. Instead, Harmony Court contends that Resident 13 "was small of

stature, very demented, very agitated and could not sit still." Br. at 20. But these observations serve only to confirm that the resident needed more care, not less, and certainly not less care than what the state surveyor thought appropriate.

### 3. 42 C.F.R. § 483.25(c)

This regulation says that a "facility must ensure that—(1) A resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and (2) A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing." The ALJ found that Resident 16 suffered from a Stage IV pressure sore on her coccyx. And after crediting the surveyor's testimony, the ALJ also found that Resident 16 did not receive preventative positioning or incontinence care for a three-and-a-half-hour period. During that time, the surveyor observed Resident 16 with a "'foul-smelling and urine-saturated incontinent brief with the time of 5:25 A.M. written on it and with the initials of a staff member from the previous shift.'" ALJ Op. at 19. Resident 16 did not have "a pressure relief device on her chair, which is essential for [treatment of] a coccyx pressure sore." *Id*.

Without presenting any evidence or testimony to rebut the surveyor's observations, the facility merely argues that Resident 16 was at high risk for pressure sores. Even if one concedes that the pressure sores Resident 16 had were unavoidable, that does not demonstrate compliance with the prevention element of the regulation, which says that "[a] resident having pressure sores [must]

receive[] necessary treatment and services to promote healing, prevent infection and prevent new sores from developing." 42 C.F.R. § 483.25(c)(2). On this record, substantial evidence supports the conclusion that Harmony Court failed to provide Resident 16 with the proper standard of care required by the regulation.

      4.      42 C.F.R. § 483.25(d)(2).

Cited in both the November and January surveys, this regulation requires "[a] resident who is incontinent of bladder [to] receive[] appropriate treatment and services to prevent urinary tract infections and to restore as much normal bladder function as possible." The ALJ found that the "greater weight of the evidence" supported the surveyor's observations as well as the surveyor's conclusion that the facility "put Resident 39 at risk for a urinary tract infection." ALJ Op. at 36. Specifically, when a nurse aide administered incontinence care to Resident 39, the surveyor observed the aide improperly clean her by wiping stool from the peri-rectal area toward the area of her urinary tract. Instead, the surveyor testified, the nurse aide should have "turn[ed] the cloth to a clean area" or should have gotten "a different cloth." JA 1463.

Harmony Court argues that Resident 39 did not have a urinary tract infection and that the surveyor observed Resident 39 receiving incontinence care on just one occasion. But this response misses the point. Whether Resident 39 had a urinary tract infection or not, the point is that the nurse

aide's care placed Resident 39 *at risk* of getting an infection because the aide did not provide "appropriate treatment." *See* 42 C.F.R. § 483.25(d)(2).

5.    42 C.F.R. § 483.25(e)(1).

This regulation requires a facility to ensure that "[a] resident who enters the facility without a limited range of motion does not experience reduction in range of motion unless the resident's clinical condition demonstrates that a reduction in range of motion is unavoidable." When Resident 18 arrived at Harmony Court, he did not have any range-of-motion limitations in his lower extremities. In just over three months, however, he developed limitations in both knees. His physician ordered the use of bilateral knee splints in an alternating four-hours-on, four-hours-off cycle. The surveyor observed Resident 18, without any knee splints, over a more than four-hour period. On the last day of the survey period, nine days after the physician's order, Harmony Court added the interventions.

Harmony Court claims that Resident 18 was easily agitated and, on occasion, would refuse to take his pills. Harmony Court also argues that Resident 18 was bedridden and that knee splints would not have helped him since "[h]e was not going anywhere." Br. at 29. But § 483.25(e)(1), not surprisingly, does not contain a difficult-to-work-with exemption. Nor has the facility supported its sweeping generalization that the range of motion in the knees of bedridden individuals necessarily will decrease. Without any evidence to the contrary from Harmony Court, the Board acted well within its authority in upholding the conclusion that the facility's lack of compliance with

the regulation worsened Resident 18's condition.  As the ALJ noted, once "his physician . . . verified Resident 18's need for knee splints, the facility was obligated to apply them or, at least, to document why it had not done so."  ALJ Op. at 19.

      6.      42 C.F.R. § 483.25(h)(1).

This regulation requires a facility to ensure that "[t]he resident environment remains as free of accident hazards as is possible."  The ALJ concluded that the state agency presented "a prima facie case that [Harmony Court] was not in compliance with" the regulation.  ALJ Op. at 37.  The facility failed to rebut the state agency's prima facie case because Harmony Court did not rebut "any of the observations testified to by the surveyors at the hearings, except to concede" that some of them were true, namely "that the janitor's closet was unlocked" and there was a "potential for harm caused by the [accessibility of] hazardous materials."  *Id*. (internal quotation marks omitted).  Indeed, the facility "contained several rooms where dangerous substances were too accessible to [the facility's] residents and presented the potential for more than minimal harm, especially to [the facility's] residents on the behavioral unit."  *Id*.

Harmony Court, again, argues that none of its residents was actually harmed by its alleged violations.  And the facility, again, fails to recognize that actual harm is not required to impose a penalty; a threat of more-than-minimal harm suffices.  The program-participation requirement charged Harmony Court to keep the "resident environment . . . as free of accident hazards as . . .

possible," 42 C.F.R. § 483.25(h)(1), and substantial evidence supports the administrative conclusion that the facility did not comply with this requirement.

       7.     42 C.F.R. § 483.25(h)(2).

Cited in the November, January and March cycles, this regulation requires a facility to ensure that "[e]ach resident receives adequate supervision and assistance devices to prevent accidents." Resident 12's comprehensive assessment stated that she was "dependent on two staff members for bed mobility, toileting, transfers and bathing." DAB Op. at 32. Notes from Harmony Court's nurses indicated that on one occasion, Resident 12 slid from her geri-chair and fell to the floor, injuring her forehead and nose. At the time of the accident, Resident 12 was in the bathroom with one nurse aide. "The aide told the surveyor that when she put a gait belt around Resident 12 and attempted to transfer her to a standing position, [Resident 12] slid forward and down in her geri-chair." *Id*. The ALJ found that "[t]he nurse aide was on the wrong side of the chair and could not get at the gait belt." ALJ Op. at 40. "Had another staff member been present on the other side of the chair, the staff member could have intervened and prevented Resident 12's sliding off the geri-chair." *Id*.

Harmony Court cannot claim that Resident 12 was not actually harmed in this instance. It instead argues that an occupational therapy assessment, conducted two weeks after Resident 12 fell, noted that only on those occasions when Resident 12 was in a state of heightened alertness and strength could a one-person transfer be used. Harmony Court, however, did not provide the ALJ with any evidence to establish the state of alertness of Resident 12 at the time of the accident. At

the time of the accident, according to the evidence and the testimony of the surveyor, Harmony

Court believed that Resident 12 required the assistance of two nurse aides for toileting and transfers.

III.

For these reasons, we affirm the decision of the Departmental Appeals Board.