UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-1491

CENTURY CARE OF THE CRYSTAL COAST,

Petitioner,

v.

MICHAEL LEAVITT, Secretary of the United States Department of
Health and Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN
SERVICES,

Respondents.

On Petition for Review of an Order of the United States Department
of Health and Human Services. (A-06-128)

Argued: May 13, 2008                    Decided: June 11, 2008

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Joseph L. Bianculli, HEALTH CARE LAWYERS, PLC, Arlington,
Virginia, for Petitioner. Gwendolyn L. Johnson, U.S. DEPARTMENT OF
HEALTH & HUMAN SERVICES, Atlanta, Georgia, for Respondents. **ON
BRIEF:** Peter D. Keisler, Assistant Attorney General, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C.; Daniel Meron, General
Counsel, Howard H. Lewis, Acting Chief Counsel, Region IV, U.S.
DEPARTMENT OF HEALTH & HUMAN SERVICES, Atlanta, Georgia, for
Respondents.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Century Care of the Crystal Coast ("Century Care"), a skilled nursing facility that provides care to Medicare and Medicaid beneficiaries in North Carolina, appeals a final agency decision of the Secretary of Health and Human Services ("Secretary"). The Secretary, through the Centers for Medicare and Medicaid Services ("CMS"), imposed a civil monetary penalty on Century Care for non-compliance with certain Medicare and Medicaid regulations requiring facilities to take reasonable steps to prevent accidents and to administer resources so as to maintain residents' physical, mental, and psychosocial well-being. 42 C.F.R. §§ 483.25(h)(2), 483.75 (2007). In Century Care's case, both an administrative law judge and the Department of Health and Human Services Appeals Board ("DAB") upheld the CMS's findings of non-compliance and its assessment of the civil monetary penalty. Because the DAB's findings are supported by substantial evidence, we affirm.

I.

A.

Federal regulations require that skilled nursing facilities participating in the Medicare and Medicaid programs comply with certain safety requirements. 42 U.S.C. § 1395i-3 (2000); 42 C.F.R. § 483. To determine whether a facility is in compliance with those requirements, the Secretary contracts with state agencies, which

2

conduct inspections, known as surveys, both on a routine basis and in response to complaints about a facility. See 42 U.S.C. § 1395aa(a) (2000); 42 C.F.R. §§ 488.10(a)(1), 488.308(a), 488.332 (2007). The surveys are conducted by multi-disciplinary, formally trained teams, each of which is comprised of at least one registered nurse. 42 C.F.R. § 488.314(a)(1).

During these surveys, the state agency records any deficiencies it discovers, along with their severity. 42 C.F.R. § 488.404(b). The severity categories range from deficiencies that result in "[n]o actual harm with a potential for minimal harm" to those that pose "[i]mmediate jeopardy to resident health or safety." 42 C.F.R. § 488.404(b)(1). A facility is deemed to be in substantial compliance with Medicare and Medicaid regulations if its deficiencies are ones that pose no greater risk than the potential for minimal harm. See 42 C.F.R. § 488.301.

Once a deficiency is identified, the CMS selects a remedy designed to address that deficiency. 42 C.F.R. § 488.408. One of those remedies is a civil monetary penalty, which the CMS may impose on a "per day" or "per instance" of non-compliance basis. See 42 U.S.C. § 1395i-3(h)(2)(B)(ii); 42 C.F.R. §§ 488.430, 488.438(a)(1)(I), 488.438(a)(1)(ii), 488.438(a)(2).

B.

A team of inspectors from the North Carolina Department of Health and Human Services ("state survey agency") conducted a

3

complaint survey of Century Care that concluded on June 18, 2004. The state survey agency determined that Century Care was not in substantial compliance with five program requirements, two of which are at issue here. The two deficiencies relate generally to the enforcement of Century Care's smoking policy, which prohibits residents from keeping cigarettes, lighters, or matches on their person or in their rooms, as well as from smoking anywhere except on Century Care's back patio. Specifically, the two deficiencies involve two Century Care residents, Resident Two ("R2") and Resident Ten ("R10"), both smokers.

R2 was admitted to Century Care in January 2004 with diagnoses of mild dementia, delirium, chronic obstructive pulmonary disease, acute pneumonia, and periods of altered perception. R2 was a chronic and heavy smoker. Because of his lung ailments, R2 received oxygen, and without his oxygen (which he often removed to smoke), he became confused and disoriented. R2 generally smoked on either Century Care's patio or front porch by wheeling himself to the dining room or the lobby, leaving his oxygen bottle in his wheelchair, and walking outside.

Despite his "typical" smoking pattern of smoking outdoors, on February 9, 2004, members of Century Care's staff approached R2 regarding reports that he had been smoking in his bathroom. R2 admitted to doing so, and he promised not to do it again. Nonetheless, a few days later on February 13, Century Care staff

4

reported smelling smoke in R2's bathroom, and staff again confronted R2 about the problem. This time, however, R2 denied that he had been smoking in violation of Century Care's policy, and he also denied having a lighter in his possession.

The state survey agency noted that on May 5, 2004, around 2 a.m., R2 -- forgetting that his oxygen was flowing -- lit a lighter in his room. His oxygen ignited. R2 was taken to the emergency room and treated for burns to the left side of his face and several fingers. After this incident, Century Care searched R2's room and found a lighter, cigarettes, and cigarette butts.

R10, also a chronic smoker, was admitted to Century Care in December 1997 with diagnoses of dementia, depression, a history of alcoholism, Alzheimer's and senile dementia, syncope and collapse, vertebral fracture, and thoracic spondylosis. R10 also suffered memory problems, impaired decision making, reduced safety awareness, and multiple risks for falling because of her wandering behavior. Due to her propensity to wander, Century Care gave R10 an electronic alarm bracelet that triggered an alarm if she tried to exit an exterior door. Further, Century Care noted in R10's care plan that she must be closely monitored, and that she was not to smoke without supervision.

R10's "typical" smoking pattern was to start smoking early in the morning and to go in and out of Century Care's alarmed patio door numerous times a day thereafter to smoke. Nonetheless, R10

was a constant violator of Century Care's smoking policy: she often was caught smoking indoors in the dining room, and she was caught multiple times with matches or a lighter in her possession. Moreover, although Century Care's staff "consistently attempted to distract her from her incessant going in and out to and from the patio," Century Care documented that R10 often smoked without her prescribed supervision.

The state survey agency noted that on April 26, 2004, R10 walked out of Century Care's building to the smoking patio, wandered through a gate that was supposed to be locked, through a line of trees, past a parking lot, and around to the back of the building where a physician's office was located. R10 sat down at a picnic table next to the physician's office. She was discovered by the physician's staff and returned to Century Care unharmed.

As a result of these incidents, the state survey agency determined that Century Care was not in compliance with 42 C.F.R. § 483.25(h)(2), which requires care facilities to provide adequate supervision and assistance to prevent accidents, and with 42 C.F.R. § 483.75, which requires a facility to be administered in a manner that enables it to use its resources such that the highest practicable physical, mental, and psychosocial well-being of each resident is maintained. CMS determined that Century Care's non-compliance existed at an "immediate jeopardy" level of severity for the period of April 26, 2004, through June 17, 2004. Accordingly,

6

CMS imposed a civil monetary penalty of $3050.00 per day from April 26, 2004, through June 17, 2004, for a total of $158,600.00.

Century Care appealed the CMS's decision, and both the ALJ and the DAB affirmed. Century Care timely appealed.

## II.

Century Care challenges the DAB's findings of non-compliance, which we review for substantial evidence. See 42 U.S.C. § 1320a-7a(e) (2000). Century Care first contends that the finding of non-compliance with 42 C.F.R. § 483.25(h)(2) (governing accidents) was not supported by substantial evidence. Likewise, Century Care argues that the finding of non-compliance with 42 C.F.R. § 483.75 (governing facility administration) was not supported by substantial evidence. We address each of Century Care's arguments in turn.[1]

---

[1]Century Care also mounts a broad challenge to the system of evidentiary burdens applied by the Secretary during the administrative review process, on the grounds that it violates the Administrative Procedure Act ("APA"). 5 U.S.C. § 500 et seq. (2000). In particular, Century Care argues that rather than placing the ultimate burden of persuasion upon the facility to prove compliance, as the Secretary does, see Hillman Rehab. Ctr. v. Health Care Fin. Admin., DAB No. 1611 (1997), that burden should be placed upon the Secretary to demonstrate that a facility is in non-compliance with Medicare and Medicaid program requirements. We need not reach this argument concerning the burden of persuasion, however, because Hillman only applies if evidence is in equipoise. See Harmony Court v. Leavitt, 188 Fed. Appx. 438, 440 (6th Cir. 2006); Fairfax Nursing Home, Inc. v. U.S. Dep't of Health and Human Servs., 300 F.3d 835, 840 n.4 (7th Cir. 2002). As we discuss below, the Secretary put forth substantial evidence to support the findings of non-compliance.

A.

Century Care first argues that its care of R2 and R10 was reasonable, and thus, substantial evidence did not support a finding of a violation of 42 C.F.R. § 483.25(h)(2), which requires a facility to "take reasonable steps to ensure that a resident receives supervision and assistance devices designed to meet his or her assessed needs and to mitigate foreseeable risks of harm from accidents." See, e.g., Windsor Health Care Ctr. v. CMS, DAB No. 1902 at 5 (2003). Specifically, Century Care argues that it took "all reasonable steps" to protect R2 from accidents, and that R10's elopement, though a "mistake," did not demonstrate unreasonable care of its residents. Therefore, Century Care contends, the finding of a violation of 42 C.F.R. § 483.25(h)(2) constituted an improper imposition of "strict liability."

Regarding R2, substantial evidence supports the finding that Century Care did not take reasonable steps to prevent his fire-related accident. To begin, as both the ALJ and the DAB noted, R2 came to Century Care with diagnoses of mild dementia and delirium, had a history of unsafe smoking behaviors, yet was still able to obtain prohibited smoking materials, such as lighters and cigarettes. Even after R2 admitted to smoking in his room on February 9, 2004, Century Care did not ask R2 where he had obtained a lighter or matches, nor did it advise visitors not to give residents lighters or matches. Further, Century Care did not

8

perform any search of R2's room after either the smoking incident on February 9 or the suspected smoking incident on February 13, even though, as the DAB noted, Century Care housekeeping found cigarette butts in R2's room between those incidents and his May 5 accident.

Nonetheless, Century Care argues that R2's accident was unforeseeable, and thus no further steps to prevent his accident could have been taken. See, e.g., Florence Park Care Ctr. v. CMS, DAB No. 1931 (2004) (holding that the regulation regarding accidents applies only to those risks of harm that are foreseeable). Specifically, Century Care contends that given its assessment of R2 as "alert" and aware of "the danger" attendant to smoking near his oxygen, and given R2's "adamant" denial of continued violations of the smoking policy on February 13, 2004, it was not foreseeable that he might make the "foolish choice" to use a lighter around his oxygen three months later. However, as both the ALJ and the DAB recognized, it was reasonably foreseeable that a resident like R2 -- who suffered mental impairment, who had a history of unsafe smoking behaviors and of smoking policy violations, who received oxygen, and who became very confused when he was not on his oxygen -- might have a fire-related accident. This is especially true given the addictive nature of smoking, and residents' likely desire to avoid being caught violating the smoking policy.

Ample evidence also supports the finding that Century Care did not provide adequate supervision of R10's smoking behavior in order to prevent accidents. R10 suffered from even more severe mental impairment than did R2, yet she too was able to obtain lighters and matches in violation of Century Care's smoking policy. And again, Century Care did not investigate how R10 obtained these items, nor did it take steps to prevent her from obtaining them. Moreover, R10 frequently smoked outside without her care-plan prescribed supervision, including on April 26, 2004, when she wandered away. Further, Century Care's staff did not report R10's elopement, nor did it take any further steps to better supervise the smoking habits either of R10 or other residents at risk of harm because of their wandering behaviors.

Century Care finally argues, and is of course correct, that a delicate balance must be struck between enforcement of its smoking policy and adherence to regulations regarding residents' personal privacy. See 42 C.F.R. § 483.10(e)(1). Here, however, Century Care did not take even the most minimal steps to prevent the dangerous accidents that can result, for example, when fire and oxygen mix, or when a mentally impaired resident wanders away. The neglect of resident safety in this case was serious, and neither respect for residents' personal privacy nor Century Care's other arguments excuse it.

10

Century Care next contends that substantial evidence does not support a finding of noncompliance under 42 C.F.R. § 483.75, which provides that "[a] facility must be administered in a manner that enables it to use its resources effectively and efficiently" to maintain its residents' physical, mental, and psychosocial well-being. While Century Care acknowledges that an administrative deficiency is a derivative finding, based on the presence of other deficiencies, see Asbury Ctr. at Johnson City v. CMS, DAB Dec. 1815 at 11 (2002), Century Care contends that there is no nexus between any non-compliance on Century Care's part and the way in which it administers its facility.

The finding that Century Care was not in compliance with the requirements of 42 C.F.R. § 483.75 is also supported by substantial evidence. Contrary to Century Care's argument, R2's and R10's accidents were part and parcel of systemic problems in the way Century Care administered its facility. Indeed, as the DAB recognized, the two incidents involving R2 and R10 were not the sole bases for the findings of non-compliance, "but rather constitute the most vivid demonstrations of the potential for dangerous consequences from a laxly and inconsistently enforced smoking policy."

As discussed above, residents were able to obtain dangerous and prohibited smoking materials. In fact, the DAB pointed out

11

that Century Care staff allowed so-called "safe smokers" to keep items such as lighters and matches with them during the day, despite the prohibition in the smoking policy. Century Care staff members also testified that residents were, in practice, permitted to smoke on the front porch, even though the smoking policy permitted smoking on the back patio only. Finally, Century Care did not adequately supervise problem smokers, such as R10, nor did it conduct adequate investigations of various smoking policy violations, such as R2's February 9 and February 13 smoking incidents. Century Care's deficient administration of its smoking policy, along with its inadequate supervision of residents' smoking habits, constituted a systemic problem that not only led to R2's injuries and R10's elopement, but also endangered all other residents at Century Care.[2]

---

[2]Even if the findings of non-compliance are supported by substantial evidence (a point Century Care does not concede), Century Care contests both the existence of "immediate jeopardy" and the extension of that period from April 26, 2004, through June 17, 2004. First, the existence of "immediate jeopardy" -- which is defined as a "situation in which the provider's non-compliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident" -- is supported by substantial evidence. 42 C.F.R. § 488.301. As the DAB recognized, R2's burns, despite being characterized by Century Care as "slight sing[ing]," required emergency room treatment and constituted an actual serious injury. Further, R2's accident likely could have caused serious injury to other residents at Century Care. Finally, R10's unsupervised smoking left her at significant risk of serious injury. In particular, as the DAB recognized, it was a "mere fortuity" that R10 was returned safely to Century Care. Once she wandered out of the unlocked gate, she was at risk of falling, getting lost, or getting struck by a car.

For the foregoing reasons, the decision of the Department Appeals Board is

AFFIRMED.

---

Second, we need not reach Century Care's challenge to the duration of the "immediate jeopardy" period. Century Care argues that the "presumption that . . . non-compliance continues until the facility comes forward and demonstrates correction" violates the APA, 5 U.S.C. § 500 et seq., and due process of law by allowing the Secretary "to impose sanctions in the absence of actual non-compliance." See Lake City Extended Care v. Health Care Fin. Admin., DAB No. 1658 (1998). The crux of Century Care's argument rests upon its premise that the incidents involving R2 and R10 were unrelated, and thus no continuing non-compliance existed between April 26, 2004, and June 17, 2004. As discussed above, however, R2's and R10's incidents are both connected to Century Care's inadequate enforcement of its smoking policy, and to its inadequate supervision of its residents' smoking behaviors. See 42 C.F.R. § 483.75. Because non-compliance during the "immediate jeopardy" period cited by the CMS is supported by substantial evidence, we need not reach Century Care's argument that the presumption of "immediate jeopardy" allows the Secretary to impose sanctions in the absence of any non-compliance.

13