In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3368

ROSEWOOD CARE CENTER OF SWANSEA,

*Petitioner*,

*v.*

THOMAS E. PRICE, Secretary of the United States Department of Health & Human Services, et al.,

*Respondents*.

Petition for Review of an Order of the
Department of Health & Human Services.
No. 2721

ARGUED APRIL 7, 2017 — DECIDED AUGUST 22, 2017

Before POSNER, RIPPLE, and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Rosewood Care Center is a skilled nursing facility participating in Medicare and Medicaid. The Centers for Medicare and Medicaid Services assessed a civil monetary penalty against Rosewood on the grounds that it had failed to protect a resident from abuse, failed to timely report or to investigate thoroughly allegations of abuse, and

failed to implement its internal policies on abuse, neglect, and misappropriation of property. CMS determined that these deficiencies placed residents in "immediate jeopardy."[1] After a hearing before an Administrative Law Judge, both the ALJ and, later, the Department Appeals Board affirmed the $6,050 per day penalty imposed by CMS. Rosewood now seeks review of that penalty.[2] It contends that the $6,050 per day penalty cannot be imposed because substantial evidence does not support CMS's immediate jeopardy determination. For the reasons set forth in the following opinion, we conclude that substantial evidence supports the Agency's findings and therefore deny the petition.

# I

## BACKGROUND

### A.

Rosewood is a skilled nursing facility, *see* 42 U.S.C. § 1395i-3(a); 42 C.F.R. § 488.301, participating in Medicare and Medicaid as a provider. Because our analysis of this case requires an understanding of the regulatory landscape for skilled nursing homes in the Medicare/Medicaid programs, we begin with a thumbnail summary of the pertinent regulatory structure.

The Secretary of Health and Human Services enforces the statutory and regulatory provisions governing nursing homes operating in the Medicare/Medicaid network through

---

[1] 42 C.F.R. § 488.301.

[2] Our jurisdiction is premised on 42 U.S.C. § 1320a-7a(e).

an agency within the Department, the Centers for Medicare and Medicaid Services ("CMS"). On the basis of contracts with the Secretary, state health agencies conduct surveys of nursing homes to determine whether they are in compliance with federal regulations. *See* 42 U.S.C. § 1395i-3(g). These surveys are conducted by state health professionals, who are specially trained for this particular task and who are guided by various federal forms and procedures in their inspections.

When the deficiencies detected during a survey "pose no greater risk to resident health or safety than the potential for causing minimal harm," CMS will consider the nursing home to be in "substantial compliance." 42 C.F.R. § 488.301. On the other hand, when CMS determines that a nursing home is not in substantial compliance, it may impose various enforcement remedies, including the imposition of civil monetary penalties, such as the ones at issue in this litigation.

There are two ranges for civil monetary penalties. CMS imposes the higher range for deficiencies constituting "immediate jeopardy." *Id.* § 488.438(a)(1)(i). Immediate jeopardy exists when the nursing home's non-compliance "has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." *Id.* § 488.301. By contrast, the lower range is for violations that do not cause immediate jeopardy, but that "either caused actual harm, or caused no actual harm, but have the potential for more than minimal harm." *Id.* § 488.438(a)(1)(ii).

To facilitate the survey and certification process, CMS's *State Operations Manual* organizes the regulations governing nursing homes in categories called "tags." The deficiencies discovered during a survey are set out in the survey findings

by use of these tag numbers. Each tag is assigned an alphabetically denominated category according to its severity and scope, from "A" to "L" (minor to major). The severity of the breach is defined by one of four categories: "[i]mmediate jeopardy to resident health or safety"; "[a]ctual harm that is not immediate jeopardy"; "[n]o actual harm with a potential for more than minimal harm, but not immediate jeopardy"; "[n]o actual harm with a potential for minimal harm." *Id.* § 488.404(b)(1). The scope of the violations also is indicated by one of three categories: "isolated," "pattern," or "widespread." *Id.* § 488.404(b)(2). CMS's *State Operations Manual* summarizes this entire categorization scheme in the following chart:

### ASSESSMENT FACTORS USED TO DETERMINE THE SERIOUSNESS OF DEFICIENCIES MATRIX[3]

| | | | |
|---|---|---|---|
| Immediate jeopardy to resident health or safety | J | K | L |
| Actual harm that is not immediate | G | H | I |
| No actual harm with potential for more than minimal harm that is not immediate jeopardy | D | E | F |
| No actual harm with potential for minimal harm | A | B | C |
| | Isolated | Pattern | Widespread |

[3] We have adapted this chart to remove information that is not relevant to Rosewood's appeal. *See* CMS, *State Operations Manual: Ch. 7—Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities*, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c07.pdf; *see also Bryn Mawr Care, Inc. v. Sebelius*, 749 F.3d 592, 594 (7th Cir. 2014).

**B.**

With this regulatory structure in mind, we turn to the particular circumstances of the case now before us. Here, surveyors of the Illinois Department of Public Health ("IDPH") conducted a survey of Rosewood. During their inspection, the state surveyors identified several violations of Medicare and Medicaid regulations that they believed justified the imposition of civil monetary penalties. The state health department may recommend penalties to CMS. The civil monetary penalty imposed here was based on a May 28, 2014 recommendation from the IDPH. Specifically, CMS imposed the penalty because of a series of failures in Rosewood's care observed during a state survey that, in its view, amounted to noncompliance at the immediate jeopardy level. At issue in this appeal are three specific citations: F 223, F 225, and F 226. In Tag F 223, the surveyors determined that the facility repeatedly failed to protect a resident, R34, from physical, mental, or verbal abuse. In Tag F 225, the surveyors found that the facility failed to investigate thoroughly incidents of abuse and failed to report timely allegations of abuse involving three residents, R34, R6, and R28. In Tag F 226, the surveyors stated that the facility failed to operationalize its Abuse Prevention Policy for incidents involving the same three residents, R34, R6, and R28.[4]

We next will examine the factual bases for these tags and then describe each of the tags based on those facts.

---

[4] Residents, facility employees, and others interviewed as part of the survey process are identified by numbers for privacy concerns.

### 1. Resident 6

R6 and his wife ("Z4") alleged that he had been mentally abused. Z4 said that when R6 was coming out of physical therapy, an unknown female staff member "put her hands on his cheeks and kissed him on one side then the other, then kissed [R6's] forehead and said 'I have always loved you.'"[5] She stressed that R6 knew "the difference between a caring kiss and someone who is trying to 'really kiss' him."[6] Z4 reported this incident to the facility administrator, Ken Kabureck, prior to the state survey. Z4 could not identify the staff member who allegedly had kissed her husband or the therapy staff member present at the time. She did say, however, that the incident had occurred on May 2, 2014.

Kabureck started his investigation of the incident upon receipt of the complaint from Z4. Specifically, Kabureck interviewed members of the therapy staff who worked on May 2, 2014. No staff member remembered any such incident. Kabureck also interviewed residents who resided on that hall. The residents did not recall any such incident; they also stated that they were not the object of any advances from staff. Based on this investigation, Kabureck concluded that he had no evidence which supported Z4's account of the incident. Notably, Kabureck did not interview R6 because R6 could not identify the person who kissed him. Nor did he formally interview Z4. Kabureck stated that he did not report this incident to the

---

[5] A.R. at 445.

[6] *Id.*

IDPH because there was no evidence that the incident had occurred.

Z4, believing Rosewood had addressed her concerns inadequately and that Rosewood was "covering up this 'harassment,'" contacted the IDPH on May 8.[7] This contact prompted the survey of Rosewood. On May 14, *during the survey and 12 days after the incident was alleged to have taken place*, Kabureck first reported the allegation to the IDPH. Two days later, he submitted a follow-up report. It included written statements from multiple staff members, who all said that they had not seen anyone kiss R6. It did not include a statement from R6, although the report indicated that he was alert and able to testify. The report only said that R6 had indicated that the person who kissed him was not wearing white.

On May 24, 2014, Kabureck sent a second follow-up report, having discovered that a facility nurse actually had kissed R6. A registered nurse for the facility indicated that she had kissed R6 on the forehead while he was walking in the therapy hall with a walker and a therapist. She explained that she had had a long talk with Z4 regarding R6's medical history immediately after R6's admission to the facility. Approximately a week later, the facility's physical therapist approached her and requested that she talk to R6 and encourage him to leave his bed for physical therapy. The nurse did speak with R6, and he indicated that he would try therapy out of bed in the therapy room. The nurse then documented that interaction in R6's nursing log, dated April 28, 2014. Approximately a week later, the nurse saw R6 in the therapy hall

---

[7] *Id.* at 446.

walking with a walker while accompanied by a therapist. The nurse kissed R6 on the forehead and told him, "You are doing a great job!"[8] The nurse recounted that R6 smiled, but did not say anything. The nurse also stated that R6 was not upset by the interaction. As before, this supplemental report contained no statement from R6.

When the IDPH surveyors, Christiane VonRonnakirk and Teresha Viverette, conducted the survey, they interviewed multiple staff members, R6, and his wife, Z4. R6 said that a staff person kissed him on both cheeks and said "I really[,] really love you."[9] He said that he was shocked and that it made him very uncomfortable. Z4 said that she reported the incident to Kabureck and that he had said that he would look into it. Later, however, Z4 also stated that Kabureck later told her that "he didn't know who did it and wasn't gonna investigate it."[10] Kabureck told the surveyors that he remembered R6's wife coming to talk to him and that she was upset. He said that he had asked physical therapy staff about the incident and that they did not know anything. He did not talk to R6 because, as he told Surveyor VonRonnakirk, he believed that R6 made up the incident.

### 2. Resident 34

While the surveyors were investigating the abuse complaint concerning R6, the IDPH received a report concerning

---

[8] *Id.* at 538 (internal quotation marks omitted).

[9] *Id.* at 471 (internal quotation marks omitted).

[10] *Id.* at 474.

R34, a 92-year-old man with end-stage dementia. This patient's records indicated that he was severely cognitively impaired and needed assistance from two staff members for all activities, including showers and transfers.

According to CNA Emily Schmidtling, on the evening of May 12, 2014, at approximately 7:30 p.m., another CNA, Tara Schlesinger, was showering R34, and "told him to sit the f--k down several times. Then [CNA Schlesinger] said oh my f--king God why do I always get your shower."[11] As R34's roommate ("R38") later described the events, "I remember hearing them yelling—talking loudly. [R34] was standing up and the [CNA] was trying to make him sit down. I don't know if she cursed or not, but she was not happy because he wasn't sitting—it was a lot of commotion for a shower."[12]

After the shower, CNA Schlesinger put R34 to bed with assistance from CNA Schmidtling. After putting R34 to bed, R34 had a bowel movement and, in the subsequent process of cleaning the patient and the bed, CNA Schlesinger tried to roll R34 over in bed, but was unsuccessful. CNA Schlesinger said that she then used the "draw sheet method" to move R34. According to CNA Schlesinger, during this process, R34 rolled close to the edge of the bed, but did not fall out or complain of any pain. CNA Schmidtling stated that "when [CNA Schlesinger] turned him over[,] [CNA Schlesinger] shoved him so hard he almost rolled off [the] bed and [CNA Schlesinger] had to grab him back."[13] At that point, CNA Schmidtling went

---

[11] *Id.* at 518.

[12] *Id.* at 470.

[13] *Id.* at 486.

down the hall to tell the licensed practical nurse on duty of the occurrence. The licensed practical nurse, Jennifer Schmidtling, did not respond, and CNA Schmidtling returned to providing care.

LPN Schmidtling stated she did not think the allegation "held any merit because these two aid[e]s ha[d] been snipping and sniping about each other behind each other's backs for the better part of three weeks."[14] She explained that "[t]he girls were complaining against each other about [not] helping [with] [R34]'s care."[15] She said that she went and viewed R34 a few minutes later and that he appeared fine. LPN Schmidtling did not tell anyone about the allegation or take CNA Schlesinger off-duty pending an investigation.

On the evening of May 15, 2014, CNA Schmidtling repeated her allegation to a registered nurse, Jennifer Haukap, telling her that "another CNA[,] Tara[,] was overly rough [and] cursed [at] [R34]" and "nearly rolled [him] off [the] bed."[16] RN Haukap recalled that CNA Schmidtling "said she told nurses that were working that night[,] but nothing happened."[17] The next afternoon, RN Haukap repeated what CNA Schmidtling had told her to the Assistant Director of Nursing, who directed her to tell the administrator, Kabureck.

---

[14] *Id.* at 521.

[15] *Id.* at 485.

[16] *Id.* at 484.

[17] *Id.* at 520.

After an investigation, Rosewood concluded that CNA Schle-singer had verbally abused R34, terminated her employment, and reported her to the state Nurse Aide Registry.

### 3. Resident 28

On December 27, 2013, R28's family reported to facility staff that rings owned by R28 were missing. At the time, R28 was in hospice and family members from out of state were visiting. The family of R28 reported the missing rings on Friday, December 27, 2013.[18] Kabureck began his investigation of the missing rings on Monday, December 30, 2013, and a report was sent to the IDPH that day. The investigation included searching linen and the resident's room for the missing rings. Staff statements also were taken, and the local police were notified. A follow-up report was sent to the IDPH on January 3, 2014.[19] The IDPH did *not* investigate this incident prior to the May 2014 survey. R28 died at the facility on December 30, 2013.

### C.

We now examine how CMS charged the deficiencies after the IDPH survey. Rosewood was cited for three deficiencies at the "immediate jeopardy" level: F 223 was at the "J" level,

---

[18] *Id.* at 320.

[19] *Id.* at 523–34.

for an "isolated" scope; and F 225 and F 226 were both at the "L" level, for a "widespread" scope.[20]

Tag F 223 found a violation of 42 C.F.R. § 483.13(b) and 42 C.F.R. § 483.13(c)(1)(i). These regulatory provisions, set out in the margin,[21] provide, in pertinent part, that the patient has the right to be free from physical, verbal, or mental abuse. CMS's finding of a violation centered on the treatment of R34 and, as noted above, was categorized as a category J violation since it was isolated in scope, but placed the patient in immediate jeopardy of health and safety.

The F 225 tag found a violation of 42 C.F.R. § 483.13(c)(2)–(4). These provisions, set out in the margin,[22] require that all

---

[20] *See* 42 C.F.R. §§ 488.406 (listing remedies) and 488.408 (categorizing remedies). *See supra* Part I.A.

[21] 42 C.F.R. § 483.13(b)–(c)(1)(i) provides:

> (b) *Abuse.* The resident has the right to be free from verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion.

> (c) *Staff treatment of residents.* The facility must develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents and misappropriation of resident property.

> (1) The facility must—

> (i) Not use verbal, mental, sexual, or physical abuse, corporal punishment, or involuntary seclusion[.]

[22] 42 C.F.R. § 483.13(c)(2)–(4) provides:

> (2) The facility must ensure that all alleged violations involving mistreatment, neglect, or abuse, including injuries

allegations of mistreatment, neglect, or abuse at the nursing facility be reported immediately to the administrator of the facility and to other officials as required by state law. These provisions further provide that the nursing facility undertake an immediate investigation to prevent further abuse while the investigation is in progress. This tag, at the "L" level, alleged that, with respect to R34, R6, and R28, Rosewood staff had failed to make timely reports to the administrator and to the IDPH. It also found that the facility failed to undertake timely and thorough investigations.

The F 226 tag found a violation of 42 C.F.R. § 483.13(c). This provision requires facilities to "develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents and misappropriation of resident property." *Id.* Notably, the provision requires that the facility not only have such policies and procedures but that it implement them. It is focused on a systemic condition within

---

of unknown source, and misappropriation of resident property are reported immediately to the administrator of the facility and to other officials in accordance with State law through established procedures (including to the State survey and certification agency).

(3) The facility must have evidence that all alleged violations are thoroughly investigated, and must prevent further potential abuse while the investigation is in progress.

(4) The results of all investigations must be reported to the administrator or his designated representative and to other officials in accordance with State law (including to the State survey and certification agency) within 5 working days of the incident, and if the alleged violation is verified appropriate corrective action must be taken.

the facility, not a particular incident. This tag, at the "L" level, stated that there had been multiple violations of this provision over a short period of time with respect to each of the residents, R34, R6, and R28.

As a result of these findings, CMS imposed a $6,050 per day penalty on Rosewood for the period of immediate jeopardy and $200 per day penalty for subsequent days of non-compliance.[23] *See id.* §§ 488.438(a)(l)(i); 488.438(f).

## II

Having set forth the administrative scheme and the factual and regulatory foundations for each of the tags, we now examine the administrative proceedings before us in this petition for review.

Rosewood appealed the civil monetary penalty first to an ALJ and then to the Department Appeals Board. We will examine each in turn.

---

[23] As noted earlier, the regulations in effect during Rosewood's survey contained two levels of civil monetary penalties. The upper range, permitting civil monetary penalties of $3,050 per day to $10,000 per day, was reserved for deficiencies which constitute immediate jeopardy. *See* 42 C.F.R. § 488.438(a)(1)(i). By contrast, the lower range of civil monetary penalties, which began at $50 per day and ran to $3,000 per day, was reserved for "deficiencies that do not constitute immediate jeopardy, but either caused actual harm, or caused no actual harm, but have the potential for more than minimal harm." *Id.* § 488.438(a)(1)(ii).

## A.

The ALJ addressed each of the tags and made findings and conclusions of law with respect to each.

With respect to Tag 223, based on the treatment of R34, the ALJ found that the evidence of Rosewood's noncompliance was "mostly uncontroverted and strongly supports CMS's allegations."[24] As a result, the ALJ concluded that "CMS's findings of immediate jeopardy level noncompliance were not clearly erroneous."[25]

In making this determination, the ALJ specifically cited evidence "establish[ing] that [Rosewood]'s staff both verbally and physically abused" R34 and failed to protect R34 from further abuse.[26] The ALJ noted that, although "[t]he cursing and verbal outbursts of the nursing assistant may not have been directed at the resident so much as they were an element of a verbal altercation between that nursing assistant and another nursing assistant," that was irrelevant because R34 "was caught in the direct line of fire."[27] The ALJ also emphasized that "the failure of the nursing assistants' supervisor initially to take the allegations of abuse seriously not only meant that serious abuse episodes were not being investigated, but

---

[24] A.R. at 3.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 4.

contributed to an ongoing climate in which more abuse could have easily occurred."[28]

With respect to Tag 225, the ALJ found that the record established that Rosewood's staff had failed to report promptly the treatment of R34 to the administrator of the facility. In his view, the failure of intermediate supervisors to address the matter not only meant that allegations of serious abuse were not investigated but also contributed to an ongoing climate in which other instances easily could have occurred. With respect to the allegations of mental abuse raised by R6's wife, the ALJ noted that the allegations remained unproven. However, in the ALJ's view, a thorough investigation must "adequately explore[] all possible avenues of evidence concerning an incident or an allegation and one that is sufficient to assure that there are not potentially fruitful areas of evidence that are left unexamined."[29] Based on this standard, the ALJ concluded that Rosewood's investigation was "palpably incomplete" because Rosewood never obtained a statement from R6 or his wife.[30]

The ALJ also considered Rosewood's delay in reporting the possible misappropriation of R28's property. The ALJ noted that, under Rosewood's own anti-abuse policy, Rosewood's administrator had a duty "to report 'immediately' to

---

[28] *Id.*

[29] *Id.* at 5.

[30] *Id.*

appropriate State authorities all allegations of abuse and mis-appropriation of property."[31] He found nothing in this policy that gives Rosewood's management "discretion to either delay reporting or to make judgments about which allegations are credible (and thus meriting reporting) and which are not (thereby not meriting reporting)."[32]

Finally, with respect to Tag 226, the ALJ determined that the failure of Rosewood's management to respond adequately to each of the situations represented a failure on its part to implement its policies.

Based on Rosewood's conduct toward these three residents, the ALJ concluded that there was "ample basis" to support the CMS's determination that Rosewood's noncompliance was "so egregious" as to place residents in a state of immediate jeopardy.[33] Specifically, the ALJ cited slow investigations as having "the consequence of leaving residents unprotected against additional instances of abuse, an extremely dangerous situation for the frail and vulnerable individuals who resided at Petitioner's facility."[34] As a result, the ALJ determined that the imposed penalties also were reasonable.

---

[31] *Id.* at 6.

[32] *Id.*

[33] *Id.* at 8.

[34] *Id.*

**B.**

Rosewood appealed the ALJ's determinations to the Department Appeals Board. The Board determined that there was adequate evidence to support each of the allegations made by CMS. It then focused on Rosewood's assertion that the IDPH survey did not support an "immediate jeopardy" rating. It rejected the argument that the rating was infirm because the IDPH officials did not interview two relevant staff members and, consequently, that the surveys were incomplete. It was clear that CMS had established a prima facie case for each violation based on undisputed facts of record. The Board observed that "ALJs and the Board may not overturn CMS's determination of the level of noncompliance, which includes immediate jeopardy, unless that determination is clearly erroneous."[35] Because Rosewood had the burden "to demonstrate[,] through argument and the submission of evidence addressing the regulatory factors, that a reduction is necessary" and did not meet that burden, affirmance was warranted.[36] Accordingly, the Department Appeals Board affirmed the level and amount of the civil monetary penalties.

---

[35] *Id.* at 20 (citing 42 C.F.R. § 498.60(c)(2)).

[36] *Id.* at 22 (internal quotation marks omitted).

## III

## DISCUSSION

Rosewood submits that the three examples of noncompliance cited, F 223, F 225, and F 226, "do not support an immediate jeopardy finding because there is no ca[us]al connection between Rosewood's noncompliance and serious injury, harm, impairment, or death of a resident."[37] Accordingly, Rosewood contends that the civil monetary penalty of $6,050 per day from May 12, 2014, through May 21, 2014, is "not supportable."[38] Rosewood also takes issue with how the IDPH surveyors conducted the survey. It claims that those surveyors "did not investigate or document the immediate jeopardy in an impartial, objective manner."[39]

Our review is limited to whether the Agency's conclusion is supported by substantial evidence. *See Fairfax Nursing Home, Inc. v. U.S. Dep't of Health & Human Servs.*, 300 F.3d 835, 839–40 (7th Cir. 2002). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached by the agency.'" *Dana Container, Inc. v. Sec'y of Labor*, 847 F.3d 495, 499 (7th Cir. 2017) (quoting *Zero Zone, Inc. v. United States Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016)).[40]

---

[37] Pet'r's Br. 11.

[38] *Id.*

[39] *Id.*

[40] *See also Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (explaining that an agency must produce "more than a mere scintilla" of evidence to

## A.

Earlier in this opinion, we have set forth the regulatory structure in which CMS evaluates allegations that a nursing home has failed to comply with its regulations.

After the state identifies deficiencies,[41] CMS categorizes the deficiencies alphabetically from "A" to "L" (minor to major), based upon their scope (isolated, pattern, or widespread) and severity. The most severe deficiencies are those that present "immediate jeopardy" to patients. *See Bryn Mawr Care, Inc. v. Sebelius*, 749 F.3d 592, 594 (7th Cir. 2014). CMS defines "immediate jeopardy" as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301.[42] As we have explained, an immediate jeopardy finding is not based "simply on the situation of each individual patient," but instead depends "on the entire state of readiness in the facility during the time in question." *Fairfax Nursing Home*, 300 F.3d

---

support its decision). We also defer to the Agency's "credibility determinations in all but extraordinary circumstances." *Dana Container, Inc. v. Sec'y of Labor*, 847 F.3d 495, 499 (7th Cir. 2017) (citing *Chao v. Gunite Corp.*, 442 F.3d 550, 557 (7th Cir. 2006)).

[41] A deficiency is a "failure to meet a participation requirement specified in the [Social Security] Act or" regulations. 42 C.F.R. § 488.301.

[42] By contrast, if the surveyors find only deficiencies that "pose no greater risk to resident health or safety than the potential for causing minimal harm," the facility is considered to be in "substantial compliance" with Medicare regulations. 42 C.F.R. § 488.301.

at 842.[43] That said, however, "[a] finding of immediate jeopardy under 42 C.F.R. § 488.301 *does not require* that the facility's actions actually harm the resident, rather, *a likelihood* that serious harm, injury, or death will result is sufficient." *Golden Living Ctr.-Frankfort v. Sec'y of Health & Human Servs.*, 656 F.3d 421, 429 n.5 (6th Cir. 2011) (emphasis added). With these principles in mind, we turn to whether substantial evidence supported the Agency's "immediate jeopardy" findings.

## B.

Rosewood first challenges Tag F 223's immediate jeopardy determination. This tag dealt with the actual abuse of R34. Under federal law, nursing home residents have the "right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms." 42 U.S.C. § 1395i-3(c)(1)(A)(ii); 42 C.F.R. § 483.13(b) ("The resident has the right to be free from verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion.").[44]

---

[43] *See also Grace Healthcare of Benton v. U.S. Dep't of Health & Human Servs.*, 603 F.3d 412, 419 (8th Cir. 2009) ("Because the definition of 'immediate jeopardy' requires that there be some causal connection between the facility's noncompliance and the existence of serious injury or a threat of injury, the nature and circumstances of the facility's noncompliance are of obvious importance to the evaluation." (internal quotation marks omitted)).

[44] We refer to the regulations as they were numbered at the time of the proceedings at issue. During the pendency of Rosewood's appeal, there was a major revision of the pertinent regulations, effective November 28,

"Abuse" is further defined as "the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish." 42 C.F.R. § 488.301.

Both the ALJ and the Department Appeals Board agreed that the record "established that Rosewood staff verbally and physically abused R.34."[45] In making this determination, the Agency relied on several written statements in the record, including that of CNA Schmidtling, which indicated that, on the evening of May 12, 2014, CNA Schlesinger cursed loudly as she attempted to shower R34. Later that evening, CNA Schmidtling also observed CNA Schlesinger turn R34 so roughly that the resident nearly rolled out of the bed and fell to the floor.

Rosewood does not dispute this evidence, but counters that substantial evidence cannot support the Agency's finding that R34 was abused because the IDPH surveyors did not interview CNA Schlesinger, and, according to Rosewood, CNA Schlesinger's account of the incident does not support a finding of abuse.

We cannot accept this submission. First, it is clear that the Agency considered the totality of the evidence in the record and CNA Schlesinger's written statement was part of that record.[46] CNA Schlesinger's statement was included in CMS's

---

2016.  As is relevant to this appeal, 42 C.F.R. § 483.13(b) is now found at § 483.12; and 42 C.F.R. § 483.13(c) is now found at § 483.12(b).

[45] A.R. at 15.

[46] *See id.* at 16 n.6 ("The written statement by T.S. upon which Rosewood relies as well as the written statements of E.S. and the nurses to whom E.S.

exhibits before the ALJ and the Department Appeals Board, and the Department Appeals Board extensively cited this statement in its decision to affirm the ALJ's findings.[47]

Additionally, despite Rosewood's arguments to the contrary, it is difficult to see how CNA Schlesinger's statement undermines a finding of abuse. In that statement, CNA Schlesinger confirms that "the resident kept trying to stand up" during the shower and, as a result, she "kept telling [the] resident to sit."[48] After the shower, CNA Schlesinger continued, the patient had a bowel movement and she "tried rolling him," but, when that did not work, she "used the pull sheet" method to move him.[49] According to CNA Schlesinger, that caused R34 to "roll[] close to the edge of the bed."[50] Except for the allegations that CNA Schlesinger cursed at R34, we read this statement as corroborating CNA Schmidtling's version of events. We also believe that it was reasonable for the board to credit CNA Schmidtling's account of verbal abuse. In addition to CNA Schmidtling's statement, R34's roommate heard

---

reported the alleged abuse were all attached to the internal investigation report of the incident that Rosewood submitted to IDPH on May 16, 2014 after the survey had begun."). The administrative record refers to CNA Schlessinger as "T.S." and CNA Schmittling as "E.S."

[47] *See id.* at 15–16; *see also id.* at 522 (CNA Schlessinger's statement).

[48] *Id.* at 522.

[49] *Id.*

[50] *Id.*

the aides "yelling" and "talking loudly" when R34 was showering.[51] LPN Schmidtling, their supervisor, also corroborated that CNA Schmidtling immediately reported the abuse.[52]

Moreover, Rosewood does not dispute an alternative ground for the finding of abuse: its failure to address the ongoing feud between CNAs Schlesinger and Schmidtling. Nothing in CNA Schlesinger's statement undermines that the dispute between the two CNAs, Schlesinger and Schmidtling, had been going on for weeks without intervention. Indeed, LPN Schmidtling's statement makes clear that the CNAs had been "snipping and sniping" at each other "for the better part of three weeks" and that both aides had been threatening to quit "for at least as long as well."[53] Rosewood acknowledges that LPN Schmidtling told the surveyor that it was "common knowledge [that] these two girls argue."[54] Based on this evidence, we believe that the Agency reasonably could infer that the feud between the aides was serious enough "to interfere with the nurse aides' ability to provide quality care to R.34 and other residents,"[55] which also made abuse likely to occur.

We also conclude that substantial evidence supports the Agency's "immediate jeopardy" finding with respect to this incident. As previously noted, "immediate jeopardy" is defined as "a situation in which the provider's noncompliance

---

[51] *Id.* at 470.

[52] *Id.* at 521.

[53] *Id.*

[54] *Id.* at 485.

[55] *Id.* at 17.

with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. The record reflects that R34 was in danger of, and, indeed, may have experienced, harm from CNA Schlesinger's yelling obscenities at him. He also was in danger of serious physical harm when CNA Schlesinger rolled him so hard that he almost fell out of bed. Finally, as the ALJ stated, R34 was endangered because Rosewood did not address the "escalating hostilities between feuding members of its own staff."[56]

## C.

Rosewood next challenges the Agency's determination in Tag F 225 that its failure to timely report and investigate all three incidents warranted an "immediate jeopardy" determination. A skilled nursing "facility must ensure that all alleged violations involving mistreatment, neglect, or abuse, including injuries of unknown source, and misappropriation of resident property are reported immediately to the administrator of the facility and to other officials in accordance with State law." 42 C.F.R. § 483.13(c)(2). Facilities also "must have evidence that all alleged violations are thoroughly investigated, and must prevent further potential abuse while the investigation is in progress." *Id.* § 483.13(c)(3). As the Eighth Circuit recognized in *Grace Healthcare*, "even allegations of abuse that prove to be unfounded must be immediately reported and thoroughly investigated." 603 F.3d at 421.

---

[56] *Id.* at 3.

Rosewood admits that (1) it did not investigate CNA Schmidtling's allegations regarding R34's treatment; (2) it did not interview R6 or his wife regarding the "kissing incident"; and (3) it did not investigate or report the alleged theft of R28's rings until Monday December 30, 2013. Nevertheless, it contends that each of these instances do not justify an "immediate jeopardy" determination. This, however, misconstrues the relevant standard. An "immediate jeopardy" finding may be based "not simply on the situation of each individual patient, but also on the entire state of readiness in the facility during the time in question." *See Fairfax Nursing Home*, 300 F.3d at 842. We therefore must consider whether the *totality* of the allegations support the Agency's determination that Rosewood's noncompliance "has caused, or [was] likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301.

Regarding the allegations of abuse against CNA Schlesinger, Rosewood contends that neither the delay in the investigation nor the failure to suspend CNA Schlesinger caused or was likely to cause harm, serious injury, or death to any resident. As noted above, however, substantial evidence does support that R34 was in danger of harm from CNA Schlesinger yelling obscenities at him and rough-handling him to the point that he almost fell out of bed. Moreover, when we consider the failure to timely report and fully investigate CNA Schmidtling's allegations, it becomes clear that this *could* have been much more serious. A CNA reported to her supervisor that her peer was rough-handling and verbally abusing a particularly fragile 92-year-old patient. Even if later proved untrue (which is not the case here), the supervisor's failure to take the CNA off-duty pending an investigation put R34 at risk of additional harm. This inaction does not fulfill

Rosewood's duty to "prevent further potential abuse while the investigation is in progress." *Id.* § 483.13(c)(3). Put starkly, R34's care plan required that he receive assistance from two staff members. The fact that two CNAs would not assist each other in rendering his care clearly placed him in jeopardy of continued abuse.

Rosewood also asserts that Kabureck's failure to interview R6 and his wife does not constitute noncompliance that caused or was likely to cause serious injury, harm, impairment, or death. Neither party asserts that the "kissing incident" constitutes *actual* abuse; indeed, the Agency determined that the evidence regarding the incident was "equivocal."[57] That, however, was not known to Rosewood at the time that R6 and his wife complained. *Cf. Luling Care Ctr. v. CMS*, DAB No. CR4082, 2015 WL 5023384, at *5 (H.H.S. 2015) ("The facility is required to report before it completes its thorough investigation and is in a position to know whether the abuse occurred.").

R6 and his wife initially approached the administrator because R6 had been "kissed" by a nurse and felt uncomfortable with the interaction. Such a complaint could have constituted abuse because facilities must "[n]ot use verbal, *mental*, sexual, or physical abuse, corporal punishment, or involuntary seclusion." 42 C.F.R. § 483.13(c)(1)(i) (emphasis added). Specifically, the record reflects that R6's wife, Z4, complained that an unknown female staff member "put her hands on his cheeks and kissed him on one side then the other, then kissed

---

[57] *Id.* at 4.

[R6's] forehead and said 'I have always loved you.'"[58] Z4
stressed that R6 knew "the difference between a caring kiss
and someone who is trying to 'really kiss' him."[59] As the ALJ
noted, this situation *could* have fallen within the type of men-
tal abuse prohibited under § 483.13(c)(1)(i).

Substantial evidence certainly supports the conclusion
that the administrator's initial investigation was not thorough
enough to have dismissed the allegations of abuse. Kabureck
interviewed therapy staff who had worked that day and other
residents to determine if they had been kissed by a staff mem-
ber or witnessed such behavior; no one indicated that they
had witnessed such behavior or that they, too, had been
kissed. But Kabureck's initial report did *not* contain *any* infor-
mation from R6 himself, despite the fact that, according to the
facility, R6 was "alert" and able to provide such information.[60]
Rosewood seems to suggest that such an interview or state-
ment would not "have yielded any information that would
have furthered the investigation."[61] Substantial evidence cer-
tainly supports the conclusion that a thorough investigation,
as required by the regulations, required Rosewood to seek in-
formation from the victim; the regulations did not permit

---

[58] *Id.* at 445.

[59] *Id.*

[60] *Id.* at 513.

[61] *Id.* at 176.

Rosewood to assume that the version offered by its own employees was the end of the matter.[62]

Finally, Rosewood contends that its failure to investigate or report the alleged theft of R28's rings did not warrant an immediate jeopardy finding. We must, however, consider the evidence in its *totality*. As the Department Appeals Board has recognized, a less serious deficiency may be "'pulled up' to immediate jeopardy by the other cited deficiencies" in a particular tag. *Spring Meadows Health Care Ctr.*, DAB No. CR1063, 2003 WL 21801713, at *17 (H.H.S. 2003).[63] When evaluated in light of the other lapses during this six-month period, Rosewood's lapse in timely investigating and reporting R28's missing rings supports the Agency's conclusion that Rosewood suffered from a systemic failure to investigate thoroughly and report promptly incidents that might endanger patients. Alongside Rosewood's other failures, substantial evidence supports that there was a systemic problem at Rosewood, which put residents in jeopardy of further harm.

---

[62] *See Ridgecrest Healthcare*, DAB No. 2598, 2014 WL 8144931, at *13 (H.H.S. 2014) (concluding that a facility's investigation of alleged abuse was not "thorough" when the facility failed to interview resident who complained of abuse); *see also* CMS, *State Operations Manual: Ch. 5—Complaint Procedures*, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c05.pdf (advising state agencies to "[i]nterview the person who made the complaint" and "the person the complaint is about" when investigating allegations of abuse).

[63] *See also Green Oaks Health & Rehabilitation Ctr.*, DAB No. CR2643, 2013 WL 4052205, at *20 (H.H.S. 2013) ("Identifying failures in a facility's obligation to provide the kind of high quality care required by the Act and the implementing regulations most often reflect judgments that will reflect a range of noncompliant behavior." (internal quotation marks omitted)).

Based on the totality of the evidence in the record, we con-
clude that the Agency's immediate jeopardy determination
regarding F 225 is supported by substantial evidence.

**D.**

Rosewood challenges two aspects of the Agency's finding
in Tag F 226 that it failed to *implement* its internal policies on
abuse, neglect, and misappropriation of property involving
all three incidents: first, it contends that it did follow its pro-
cedures; and second, it warns that a contrary determination
would allow CMS to impose fines arbitrarily because any vi-
olation of an entity's established procedures could be used to
support an immediate jeopardy determination.

Skilled nursing facilities must "develop and implement
written policies and procedures that prohibit mistreatment,
neglect, and abuse of residents and misappropriation of resi-
dent property." 42 C.F.R. § 483.13(c). As the Department Ap-
peals Board has explained, "[s]ection 483.13(c) by its plain
terms does not address neglect or abuse per se, but" instead
"requires a facility to have and implement [its own] policies
and procedures to prohibit abuse and neglect." *Columbus
Nursing & Rehab. Ctr.,* DAB No. 2398, 2011 WL 3251325, at *8
(H.H.S. 2011).

Rosewood first asserts that it complied with § 483.13(c) be-
cause it had appropriate procedures in place, which it also fol-
lowed. For instance, Rosewood points out that it educated
every new employee on its anti-abuse policies, and each em-
ployee was required to sign that he or she had reviewed and
understood the anti-abuse policies. Rosewood notes that all
nurses, CNAs, and LPNs involved with R34, R6, and R28 had

read the abuse and neglect policy and indicated that they understood the policy.

These are no doubt commendable steps in implementing policies. But the Agency does not claim that Rosewood completely failed to implement its policies; it simply found that Rosewood failed to implement them in significant ways and that those failures seriously jeopardized the welfare and safety of its patients. There is substantial evidence of record that, whatever salutary programs Rosewood may have implemented, it did not adequately implement its own "Abuse Investigation Policy" by seeing that "all allegations of abuse (possible physical, emotional, sexual, verbal, and/or misappropriation of property) [were] reported immediately to the State Agency in accordance with current regulations."[64] As previously discussed, Rosewood violated this policy by failing to report the allegations of abuse regarding R6 and R34, and by failing to timely report R28's missing rings.

Rosewood's policy also states that "[r]esident and family concerns will be documented, reviewed, addressed and responded to."[65] Substantial evidence supports the view that Rosewood violated this policy when it failed to document, review, or address adequately the concerns of R6 and his wife about the "kissing incident." LPN Schmidtling also failed to follow Rosewood's policies when she failed to "report suspi-

---

[64] A.R. at 489 (emphasis removed).

[65] *Id.* at 495.

cions of neglect or abuse to [the administrator] immediately."[66] LPN Schmidtling did not report CNA Schmidtling's allegation that CNA Schlesinger abused R34; she also violated the policy when she failed to bar CNA Schlesinger from further contact with residents pending investigation.[67] In short, these multiple lapses support the Board's conclusion that there was a *systemic* failure to implement Rosewood's policies aimed at conforming to federal regulations.

## E.

Rosewood's final argument asserts that the IDPH's investigation was so inadequate that the imposition of civil monetary penalties is unwarranted. Rosewood, however, also concedes that "an allegation of an inadequate survey performance does not otherwise invalidate adequately documented deficiencies."[68] We agree. The plain language of 42 C.F.R. § 488.318(b) states: "Inadequate survey performance does not—(1) [r]elieve a SNF or NF of its obligation to meet all requirements for program participation; or (2) [i]nvalidate adequately documented deficiencies." As the Government correctly notes, there are remedies, outside of this appeal, that the Secretary of the Department of Health and Human Services separately can impose on the IDPH for inadequate survey performance. *See id.* § 488.320(b) (describing "[s]anctions for inadequate survey performance"). Those remedies, how-

---

[66] *Id.* at 493.

[67] *Id.* at 489.

[68] Pet'r's Br. 20.

ever, do not include allowing facilities to escape responsibility for supported deficiencies. *Id.* § 488.318(b). At bottom, CMS made out a prima facie case of serious violations, and Rosewood was unable to rebut that case. Substantial evidence supports the determination of the Agency.

## Conclusion

For the reasons set forth in the foregoing opinion, the Department Appeals Board's decision was supported by substantial evidence. The petition for review is denied.

PETITION DENIED