In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2147

NEIGHBORS REHABILITATION CENTER, LLC,

*Petitioner,*

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DEPARTMENTAL APPEALS BOARD, and CENTERS FOR MEDICARE AND MEDICAID SERVICES,

*Respondents.*

Petition for Review of a Final Decision of the
Department of Health and Human Services.
No. 2859

ARGUED NOVEMBER 5, 2018 — DECIDED DECEMBER 7, 2018

Before BAUER, ROVNER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Neighbors Rehabilitation Center is a skilled nursing facility participating in Medicare and Medicaid. The Centers for Medicare and Medicaid Services ("CMS") assessed a civil monetary penalty against Neighbors after concluding that Neighbors inadequately addressed sexual interactions between three cognitively impaired residents.

CMS determined that Neighbors' failure to act put the residents in "immediate jeopardy," and, as a result, issued Neighbors a citation and an $83,800 penalty. After a hearing, an administrative law judge affirmed the citation and penalty, and the Department of Health and Human Services Departmental Appeals Board upheld the ALJ's decision. Neighbors seeks review of the citation, the immediate jeopardy categorization, and the amount of the penalty. We conclude that substantial evidence supports the Agency's determinations and we therefore affirm.

## I. Background

Neighbors provides nursing care to residents, including those with dementia and Alzheimer's disease. Neighbors participates in the Medicare program and is subject to compliance with the Medicare Act, which CMS monitors.

### A. Regulatory Framework

CMS delegates surveys of participating facilities to state agencies, including, here, the Illinois Department of Public Health ("IDPH"). 42 U.S.C. §§ 1395aa(c), 1395i-3(g). Surveys are conducted by "a multidisciplinary team of professionals (including a registered professional nurse)." *Id.* § 1395i-3(g)(2)(E)(i).

When conducting a survey, IDPH determines whether a facility is in substantial compliance with Medicare requirements, meaning "a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301. IDPH may issue a citation to a facility if it finds a deficiency in compliance. Deficiencies are classified by a letter category A-L, with L being

the most severe. The more severe tags are imposed when there is "immediate jeopardy" to residents. "Immediate jeopardy means a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." *Id.* The following is an overview of the deficiency categorizations:

| Immediate jeopardy to resident health or safety | J | K | L |
|---|---|---|---|
| Actual harm that is not immediate | G | H | I |
| No actual harm with potential for more than minimal harm that is not immediate jeopardy | D | E | F |
| No actual harm with potential for minimal harm | A | B | C |
| | Isolated | Pattern | Widespread |

*Rosewood Care Ctr. of Swansea v. Price*, 868 F.3d 605, 609 (7th Cir. 2017) (chart adapted from CMS, *State Operations Manual: Ch. 7—Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities*, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c07.pdf).

Deficiencies may result in the imposition of a civil monetary penalty. 42 U.S.C. § 1395i-3(h)(2)(B)(ii)(I). The penalty is imposed from the time the facility goes out of compliance until it returns to substantial compliance. Penalties for "immediate jeopardy" deficiencies range from $3,050-$10,000 per day. 42 C.F.R. § 488.438(a)(1). Penalties for "deficiencies that do not constitute immediate jeopardy, but either caused actual

harm, or caused no actual harm, but have the potential for more than minimal harm" range from $50-$3,000 per day.[1] *Id.*

## B. Resident Interactions

The deficiency here relates to Neighbors' handling of the sexual interactions of three residents with dementia and/or Alzheimer's, whom we will refer to as R1, R2, and R3.

At the time of the incidents, R1 was an 80-year-old male resident suffering from dementia and behavioral disturbances. Despite his diagnoses, he functioned at a high level. As of February 2013, R1's care plan stated that staff should assess if R1's behavior endangered other residents and intervene if necessary. In January 2014, R1's care plan was updated to show that he exhibited inappropriate and disruptive behaviors that affected residents and staff.

R2 was a 65-year-old male resident suffering from Alzheimer's, dementia, behavioral disturbances, and lower extremity cerebral vascular disease. He had significant cognitive and hearing impairments and trouble speaking. His vision was also somewhat impaired. People communicated with R2 by writing on a dry-erase board in his room, and he used a wheelchair. R2 exhibited socially inappropriate behaviors including asking staff to perform sexual acts and inappropriately touching staff. He also physically acted out towards others and was verbally threatening.

R3 was a 77-year-old female resident suffering from Alzheimer's. She had very low cognitive functioning and a severe hearing impairment. R3 was also prone to wandering.

---

[1] Respondents note that these were the penalties at the time of the citation. The penalties remain the same in the current version of the regulations.

R1 and R2 resided in two separate rooms connected by a shared bathroom. On February 4, 2014, a nursing assistant saw R1 in R2's room. The covers on R2's bed were pulled back and R1 was "masturbating" R2. The nursing assistant did not see R2 objecting and so she did not intervene. Neighbors' staff documented the interaction in the residents' nursing notes but did not investigate further.

One day later, R2 told a nursing assistant that he had heard rumors going around that he was homosexual, and R2 stated that he was not homosexual. On February 8, 2014, a nurse saw R1 in R2's room, touching R2's penis. Although R2 was not objecting, the nurse told R1 to leave the room. When R1 and R2 were later asked about these interactions, R1 denied having any kind of relationship with R2, and R2 could not recall any interactions with R1.

On February 11, 19, and 20, 2014, R2 fondled R3's breasts. R2 also made inappropriate sexual comments to R3, and, on a date unclear from the records, "grabb[ed] R3's vagina." An aide witnessed R2 and R3's February 19 interaction and moved R2 away from R3. In a later interview, the aide stated that she moved R3 away from R2 because "she can't hear him, she doesn't understand what he wants" and that the separation was for R3's "safety." Other than on February 19, Neighbors' staff did not intervene in any interactions between R2 and R3. Throughout this period, R2 also exhibited inappropriate verbal and physical behavior towards Neighbors' staff, including trying to kiss them and asking them to "stick your hand down there."

## C. Imposition and Affirmance of the Citation

From February 20 to 26, 2014, IDPH conducted a "Complaint Investigation" survey at Neighbors. Its investigation centered on the aforementioned sexual interactions. IDPH determined that Neighbors had violated then-regulation 42 C.F.R. § 483.25(h)[2]:

> Accidents. The facility must ensure that—
>
> (1) The resident environment remains as free of accident hazards as is possible; and
>
> (2) Each resident receives adequate supervision and assistance devices to prevent accidents.

IDPH classified the deficiency as causing "immediate jeopardy" and categorized it as level J.[3]

IDPH found that Neighbors allowed residents to have consensual sexual interactions and that supervisors told Neighbors' staff that they were not to intervene or report sexual interactions unless a participant showed outward signs of non-consent. One of Neighbors' staff members stated that, per Neighbors' policy, she was taught to "just separate, if no one resisting then it is ok." Another staff member advised that she was "taught to provide privacy and intervene if there is protesting by one of the residents."

Pursuant to IDPH's findings, CMS fined neighbors $5,150 per day from February 4 to 19, 2014. CMS lowered this fine to $100 per day for the period of February 20 to March 5, 2014,

---

[2] Now codified at 42 C.F.R. § 483.25(d).

[3] IDPH initially documented two deficiencies, but later amended its findings to delete one of those deficiencies after Neighbors submitted additional documentation to refute that deficiency.

when Neighbors had removed the residents from immediate jeopardy but had not yet returned to substantial compliance. The total penalty amounted to $83,800.

Neighbors challenged the citation and civil monetary penalty and requested a hearing. The parties submitted prehearing briefs with exhibits and testimony. Neighbors' opposition to the citation centered on the argument that residents, even those with cognitive impairments, have the right to engage in consensual intimate relationships. Neighbors stated that staff was aware of the relationships between the residents and monitored them as necessary.

The ALJ held a videoconference hearing at which he heard testimony from the IDPH surveyor and Neighbors' former Director of Nursing. After the hearing, the parties submitted posthearing briefs. In a written decision dated July 21, 2017, the ALJ affirmed the citation and penalty.

Regarding the interactions between R1 and R2, the ALJ noted that Neighbors had taken "meager action" to determine whether R2 consented to the interactions, only belatedly inquiring with the residents as to the nature of the interactions. The ALJ noted that R2's lack of memory as to the incidents was only reflective of his Alzheimer's and could not be interpreted as consent. Moreover, R1's denial of any relationship with R2 should have caused concern because it was "at best, misleading." The ALJ concluded that both R1's and R2's statements "should have prompted further investigation."

The ALJ concluded that Neighbors' policy of intervening only when outward signs of non-consent were displayed was insufficient to determine consent, "especially where, as here, the victim has significant cognitive deficits." The failure to

determine whether the interaction was consensual resulted in a second interaction between R1 and R2. And although a nurse did break up that second interaction, she was counseled for her actions.

The ALJ also concluded that there was insufficient evidence of consent between R2 and R3. The ALJ noted that, despite Neighbors' non-intervention policy, an aide had separated R2 and R3 because she was concerned for R3's safety. Neighbors took no action thereafter to determine whether R3 had the capacity to consent or had in fact consented to the sexual interactions.

Because there was insufficient evidence of consent and a failure to adequately investigate such consent, the ALJ affirmed the citation. Turning to the immediate jeopardy question, he noted that, per 42 C.F.R. § 498.60(c)(2), "CMS's determination that a deficiency constitutes immediate jeopardy must be upheld unless the facility shows that the determination is clearly erroneous." The ALJ reiterated that a finding of immediate jeopardy does not require actual harm, only a likelihood of serious harm. The ALJ stated that there was "no question" that R2 and R3 had been placed in immediate jeopardy. Neighbors' "misguided" non-intervention policy left residents at risk of victimization, "especially those with severe cognitive or other deficits which may have adversely impacted their ability to actively protest or object."

Finally, the ALJ found that the $83,800 civil monetary penalty was reasonable considering Neighbors' level of culpability, history of noncompliance, and financial condition. *See* 42 C.F.R. §§ 488.438(f), 488.404.

Neighbors appealed the ALJ's decision to the Departmental Appeals Board. The Board concluded that the ALJ's findings were supported by substantial evidence and his conclusions were free of legal error. The Board noted that the key inquiry was not whether the residents could consent to sexual interactions as a general matter, but whether Neighbors actually assessed whether the residents could consent, determined that they did consent, and monitored the residents to ensure their continued safety. The Board stated that Neighbors' failure to undertake any such assessment supported the ALJ's determination.

## II. Discussion

Our review of the Agency's determination "is limited to whether the Agency's conclusion is supported by substantial evidence." *Rosewood*, 868 F.3d at 615; *see also* 42 U.S.C. §§ 1320a-7a(e), 1395i-3(h)(2)(B)(ii)(I). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached by the agency.'" *Id.* (quoting *Dana Container, Inc. v. Sec'y of Labor*, 847 F.3d 495, 499 (7th Cir. 2017)).

Neighbors challenges the Agency's determinations on (1) Neighbors' noncompliance with then-regulation 42 C.F.R. § 483.25(h), (2) the immediate jeopardy categorization, and (3) the reasonableness of the $83,800 civil monetary penalty. We address each argument in turn.

### A. Challenge to the Citation

Neighbors does not dispute that the sexual interactions between R1, R2, and R3 occurred. What Neighbors does dispute is whether its handling of the interactions was inadequate or hazardous under then-regulation 42 C.F.R. § 483.25(h).

Neighbors argues that its policies were sufficient to moni-
tor residents' sexual interactions in a way that "balances both
the resident's need for privacy and dignity and the safety of
each resident," and that the staff were taught to look for signs
that a relationship was non-consensual. Neighbors' former
Director of Nursing testified before the ALJ that all three res-
idents were able to show non-consent by yelling, hitting, kick-
ing, scratching, or pushing. According to the former Director
of Nursing, Neighbors' staff worked with these residents
daily and were aware of the behaviors the three residents ex-
hibited when they did not want to be touched or interacted
with. In none of the sexual interactions did the residents ex-
hibit any of these signs of non-consent.

Certainly, those who reside in long-term care facilities are
entitled to the dignity of maintaining intimate relationships.
It is also true, however, that when those persons are cogni-
tively or physically impaired, care must be taken by a facility
to ensure that those intimate relationships are consensual.
The record reflects that Neighbors failed to exercise this care.

The evidence in the record shows only that the staff was
aware of the interactions, and on two occasions, broke up the
interactions. Neighbors' records show no evidence that it un-
dertook any investigation into whether the interactions were
consensual or whether the residents had the capacity to con-
sent. As the Departmental Appeals Board aptly stated, the ci-
tation was primarily supported by what Neighbors' staff did
*not* do:

> They did not talk to the residents about their feelings
> about these "relationships"; they did not document
> the residents' capacity for consent (or lack thereof)
> or communicate with residents' physicians for

> medical assessment of how their cognitive deficits
> impacted that capacity; they did not discuss the de-
> velopments with the residents' responsible parties
> and/or families; they did not record any monitoring
> of the behaviors or make any care plans to account
> for them.

The ALJ's decision shows that he carefully reviewed the IDPH survey notes, resident records, both parties' submitted testimony, and more. The IDPH survey notes are detailed and reflect interviews with eleven of Neighbors' staff members including administrators, nurses, and aides. The survey notes detail the relevant entries in the residents' nursing notes and describe those entries alongside interview notes regarding each interaction. The survey notes, and the records they are based on, reflect that staff did not follow up after the sexual interactions and continued to follow a non-intervention policy.

Neighbors' staff did not ask R1 and R2 about their interactions until February 20, 2014, the day the IDPH investigation began and over two weeks after the observation of the first interaction between R1 and R2. As the ALJ noted, that R1 lied about the interactions and that R2 had no recollection whatsoever were red flags that merited additional investigation. More alarmingly, Neighbors failed entirely to follow up with R2 and R3 about their interactions despite one staff member noting that she was concerned for R3's safety.

The ALJ repeatedly highlighted the serious cognitive deficits of R2 and R3 (which were documented in the record) and observed that these deficits created an even greater need to investigate whether any abuse was taking place. Yet the record reflects that no such investigation occurred. Neighbors

would have us hold that it is appropriate to presume consent as long as there is no resistance. To do so would be to hold persons with dementia and Alzheimer's to a higher standard than we hold the average person. *See, e.g.*, *United States v. Johnson*, 743 F.3d 196, 199 n.1 (7th Cir. 2014) (noting that, under Illinois law, resistance is not necessary to prove sexual assault); *see also United States v. Cobenais*, 868 F.3d 731, 740 (8th Cir. 2017) (noting that, under 18 U.S.C. § 2241(a), the government need not show that a sexual abuse victim resisted).

We conclude that the citation is supported by substantial evidence.

## B. Challenge to the Immediate Jeopardy Categorization

We turn next to the categorization of the deficiency as causing immediate jeopardy. As described above, an immediate jeopardy deficiency is one "in which the provider's noncompliance … has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. The ALJ and the Departmental Appeals Board must uphold an immediate jeopardy categorization as long as it is not clearly erroneous, and we review that decision under the substantial evidence standard. *See Rosewood*, 868 F.3d at 615, 617; 42 C.F.R. § 498.60(c)(2).

Neighbors argues that the evidence does not support a finding that its actions were likely to cause harm to its residents. Neighbors claims that, had a staff member, resident, or anyone else suspected abuse, he would have immediately acted in accordance with Neighbors' abuse prevention policy.

Neighbors' argument is unsupported by the evidence. Neighbors' non-intervention policy prevented any real inquiry into consent, except in the extreme situation where a

resident was yelling or physically acting out. Two of Neigh-
bors' staff members separated the residents—staff members
who, according to Neighbors, were familiar with the resi-
dents' capabilities and behavior. Still Neighbors took no steps
to investigate whether any of the residents had been the sub-
ject of a non-consensual interaction. In fact, Neighbors did the
opposite, disciplining the nurse who separated R1 and R2 for
violating the non-intervention policy.

Given that Neighbors' non-intervention policy led to the
recurrence of sexual interactions, we cannot say that the im-
mediate jeopardy categorization was unsupported by sub-
stantial evidence. To the contrary, the record is replete with
evidence that Neighbors' deficiency was likely to cause, and
may have actually caused, serious harm to the residents. For
these reasons, we agree with the ALJ and the Departmental
Appeals Board that a categorization of immediate jeopardy
was not clearly erroneous here and is indeed supported by
substantial evidence in the record.

## C. Challenge to the Civil Monetary Penalty

Finally, we address Neighbors' challenge to the amount of
the civil monetary penalty. Neighbors requests that, if we de-
cide to affirm the citation, we reconsider the $83,800 penalty.

As long as the basis for imposing a civil monetary penalty
exists, *e.g.*, a citation supported by substantial evidence, the
ALJ is not permitted to reduce the penalty to zero. Instead, the
ALJ is limited to reviewing (1) "[t]he facility's history of non-
compliance, including repeated deficiencies" and the rela-
tionship of past and present deficiencies; (2) "[t]he facility's
financial condition;" (3) the deficiency categorization (*i.e.*, A-
L); and (4) the facility's "degree of culpability." *See* 42 C.F.R.

§§ 488.438 (e)-(f), 488.404. Once the ALJ reviews these factors and determines that the penalty is reasonable, we will uphold that determination as long as it is supported by substantial evidence. *See, e.g.*, *Grace Healthcare of Benton v. U.S. Dep't of Health & Human Servs.*, 603 F.3d 412, 418 (8th Cir. 2009) (holding that a finding that a civil monetary penalty is reasonable in amount "must be supported by substantial evidence").

The ALJ reviewed the relevant factors. He noted that Neighbors had a history of noncompliance under the Medicare Act, that Neighbors could afford the civil monetary penalty, and that Neighbors was "very culpable" in the incidents involving R1, R2, and R3. The ALJ further noted that the penalty was on the low end of the possible penalties that could have been imposed. The ALJ concluded that the penalty was reasonable, and the Departmental Appeals Board upheld the ALJ's conclusion. We turn to whether this conclusion was supported by substantial evidence.

The first factor for consideration is Neighbors' history of noncompliance. Neighbors had previously been found to be deficient under multiple regulations, including the same regulation at issue here, then-regulation 42 C.F.R. § 483.25(h). Neighbors argues that its past noncompliance was not related to the noncompliance at issue here and thus "does not show a pattern of similar noncompliance." Under the regulations, however, the lack of a clear pattern is not dispositive. CMS may consider both previous citations for the same deficiencies, as well as the facility's "prior history of noncompliance in general," 42 C.F.R. § 488.404(c), and therefore consideration of Neighbors' past deficiencies was appropriate, even if it was not for the exact same misconduct.

The next factor is the facility's financial condition. Neighbors initially asserted that its financial condition was a reason to reduce the civil monetary penalty, an argument it does not raise here. Specifically, Neighbors alleged that the large amount of the penalty could impact its continued operation. Because counsel has not raised further concerns about Neighbors' financial condition, we will assume that Neighbors no longer challenges the penalty under this factor.

The final factors for consideration are the deficiency categorization and the facility's degree of culpability. Neighbors' argument that the penalty is not reasonable given these factors is tied to its argument that it was not deficient generally—*i.e.*, because Neighbors' policy was appropriate and adequate, it was unreasonable to impose a penalty. We have already determined that the citation and immediate jeopardy categorization are supported by substantial evidence. We agree that Neighbors was "very culpable" and we find the penalty to be reasonable given the degree of harm at issue.

### III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the Departmental Appeals Board.